UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CARL KETTLE,
LARRY BIESUZ JR., and
DAVID TREDO
on behalf of themselves and others similarly situated

                                       1:19-cv-504-LJV

                              Plaintiff,

v.

NEW YORK STATE THRUWAY AUTHORITY;
CONDUENT STATE & LOCAL SOLUTIONS, INC.;
LINEBARGER GOGGAN BLAIR & SAMPSON, LLP

                              Defendants.
_____

## AMMENDED COMPLAINT

## INTRODUCTION

Plaintiffs bring this action on behalf of themselves, and other similarly situated persons, pursuant to 42 U.S.C. §1983, the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and the New York State Constitution. This suit concerns fines imposed by Defendants where timely payment has not been received for nonpayment of a cashless toll at the Grand Island Bridge. As laid out further below, the Defendants have collected, and have threatened to collect unconstitutionally excessive fines of more than 50 times the toll violation from Plaintiffs, and have denied Plaintiffs any reasonable opportunity to dispute the imposition of this fine.

## PARTIES

1. Plaintiff Carl Kettle is a citizen of the State of New York, County of Erie, and city of Buffalo, residing at 310 Roesch Ave, #12, Buffalo, NY 14207.

2. Plaintiff Larry Biesuz Jr. is a resident of the State of New York, County of Niagara, and city of Lewiston residing at 855 Page Ave, Lewiston, NY 14092.

3. Plaintiff David Tredo is a resident of the State of New York, County of Erie, and city of Buffalo, residing at 154 Delamere Rd, Buffalo, NY 14221

4. The Defendant New York State Thruway Authority (hereinafter "NYSTA") is a public corporation of the State of New York.  It consists of seven members, appointed by the governor and confirmed by the senate.  The power is vested in the exercise of the majority of the board, and the board is permitted to delegate its authority.

5. Defendant ("NYSTA") is a state actor for the purposes of §1983.

6. Defendant Conduent Local Solutions, Inc. ("Condeunt") is a New York corporation with its headquarters at 100 Campus Drive, Florham Park, New Jersey.

7. Defendant Conuent is and has been a publically traded company, that, among other things, provides the billing and money transfers from Defendants' EZ-Pass and Tolls-By-Mail program.   It has a multi-million dollar contract with Defendant NYSTA to administer the "back-room" cashless tolling operations in the state of New York.

8. At all relevant times, Conduent was responsible for mailing the bills and notices described herein to Plaintiff and class members for EZ-Pass and Tolls-By-Mail fees.

9. When Conduent mailed a notice to Plaintiff or other class members, the notice itself would purport to be from Defendant NYSTA.   Conduent did this with the authority of Defendant NYSTA.

10. Upon information and belief, Defendant Conduent receives a percentage of the amounts it recovers from drivers on behalf of the other Defendants.  The remainder goes to the New York State Thruway Authority.

11. Defendant Conduent is a state actor for §1983 purposes.

12. The Defendant Linebarger Goggan Blair & Sampson, LLP ("LGBS") is a limited liability partnership organized under the laws of the state of Texas and doing business in the state of New York.

13. Defendant LGBS collects money allegedly owed to Defendant NYSTA pursuant to its statutory authority.

14. The collection of fines and revenue is traditionally a function of the state.

15. At least some of the funds collected by Defendant LGBS would be paid to Defendant NYSTA.

16. Defendant LGBS was therefore acting under color of state law (namely the NYSTA) at all times relevant to this complaint.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over the Plaintiff's federal claims pursuant to 28 U.S.C. §1331 as an action raising a federal question; pursuant to 28 U.S.C. § 1343(3) as an action to redress a deprivation under color of state law of rights secured by the Constitution of the United States.

18. This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. §1367(a).

19. Supplemental jurisdiction is also appropriate pursuant to the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. §1332(d) based on both the amount in controversy, and the diversity of the parties.

20. Venue lies in the Western District of New York pursuant to 28 U.S.C. § 1391(b)(2) as the judicial district in which the events occurred that gave rise to Plaintiff's causes of action.

**BACKGROUND ON CAHSLESS TOLLING AND HOW THE SYSTEM WORKS**
***IN THEORY***

21. The Grand Island Bridge toll system is operated by Defendant NYSTA.

22. The Grand Island Bridge toll station was, at the times relevant to this complaint, a cashless toll facility.  This means that the only way to pay a toll at the Grand Island Bridge was to have an EZ-Pass.

23. EZ-Pass is an electronic toll collection system that allows individuals to prepay their tolls, thus eliminating the need to stop at a toll plaza.  The system has three components: a toll tag, which is placed on the vehicle; an overhead antenna, which reads the toll tag and collects the toll; and video camers to identify toll evaders.  EZ-pass maintains records regarding each user's usage and account balance.  Users can associate a credit card with their EZ-pass, or they can deposit money ahead of time into their EZ-pass account to pay their tolls.

24. If a vehicle drives through the Grand Island Bridge toll facility without being linked to an EZ-Pass account, New York will assess a fee using the "Tolls-By-Mail" system.  First, a picture of the car and its license plate is taken as the car passes through the cashless toll on the bridge.

25. Defendant NYSTA has entered into a contract with Defendant Conduent to administer the Tolls-By-Mail system.  Since 2007, Defendant NYSTA has paid Conduent $317 million  to run its Tolls-By-Mail and cashless tolling infrastructure.

26. In theory, after a driver goes through a cashless toll plaza, Defendant NYSTA claims that they should be able to call or go online immediately and pay their bill.

27. Additionally, it is the alleged policy of Defendant NYSTA to eventually send out a notice when it has evidence that a car registered to a New York state resident has crossed the Grand Island Bridge without paying the cashless toll.

28. When it goes out, the notice demands $1.00 per crossing, which is equal to the amount off the cashless toll.

29. The most current version of this notice also permits the submission of a dispute, for the following reasons: (a) the vehicle has been sold; (b) the license plate(s) have been surrendered; (c) the vehicle/plate was stolen; or (d) the license plate and/or vehicle is not registered to me and I did not rent and/or lease it.

30. A sample of the notice described in the preceding paragraphs, taken from Defendant NYSTA's website, is attached as **Exhibit A**.

31. Defendant NYSTA alleges that it is their policy that if payment is not received within 30 days of the first notice, that a second notice will be sent out, imposing a $5.00 late fee. NY CCR§101.3 does not appear provide any authority for the imposition of a "late fee."   Rather, it permits Defendant NYSTA to charge up to a "$100" administrative fee.

32. Defendant NYSTA alleges that it is their policy that, if no payment is received within 30 days of this second notice, that a "violation fee" of $50 is imposed, and the $5.00

late fee is removed.   If the toll and violation fee are not paid within 30 days, Defendants refer the matter to LGBS for collection.

33. The notice implementing the "Violation Fee" does not put forward any way for recipients to dispute the imposition of this fee.   A sample of the notice sent to Plaintiff Kettle is attached as **Exhibit B**.

34. If payment could not be secured by the Defendants Conduent and NYSTA, they would refer the matter to Defendant LGBS, whom Defendant NYSTA authorizes to collect on its behalf.   Defendant NYSTA also authorizes Defendant LGBS to settle outstanding debts on its behalf for less than the original amount.

### *REALITY*: CONDUENT HAS A LONG HISTORY MALFEASENCE AND OF MISMANAGING CASHLESS TOLLING SYSTEMS

35. Beginning in 2015, notorious corporate raider Carl Icahn became involved in Xerox. At that time, Conduent was operating as a subsidiary of Xerox. In 2016,  Conduent separated from Xerox and has been a publically traded company ever since.  At the time, Icahn hailed the spin-off as a move that would create value for shareholders.

36. Conduent's business model depends on maximizing revenue from the government systems that it operates.  Practically speaking, this means that it has motive to extract as much as possible in fines from residents of New York.

37. Not only does it have a motive to extract more in fines, it has implemented patently unfair policies to extract more in fines from New York residents.

38. For instance, according to New York State Legislator Diane J. Savino, while it was under Xerox, Conduent issued standing orders to its workers not to tell customers if their credit card was nearing its expiration date unless explicitly asked.   The idea

being that if people neglected to update their credit card information, their EZ-Pass would not pay for their cashless toll and Conduent could profit off of violation fees through the Tolls-By-Mail system.

39. Conduent has a similar motive to be lax about its quality control when it sends out the initial bills when a resident passes through a cashless facility without an EZ-Pass.  If those notices are not received, Conduent can profit off of the $50 fee imposed by Defendant NYSTA.

40. Before it was awarded a multi-million dollar contract to administer New York's Tolls-By-Mail program, Defendant Conduent had state contracts to administer cashless tolling programs in the states of California, Florida, Maryland, and Texas.  In all of these states, Defendant Conduent has left behind a trail of lawsuits, malfeasance, and widespread complaints of outrageous billing practices from residents.

41. In Florida, Defendant Conduent was awarded a half-billion dollar contract to manage Florida's cashless tolling system.  It has since been revealed that the state of Florida paid $3.6 million dollars to have one of Conduent's competitors drop its bid for this contract.

42. After receiving this contract from Florida, Defendant Conduent quickly fell behind in processing tolls, leading to over-billing, poor customer services, and a backlog of millions of unpaid tolls.[1]

---

[1] Pransky, Noah.  *SunPass saga, day 69: Conduent says everything is under control*. WSTP 10 NEWS, https://www.wtsp.com/article/news/investigations/sunpass/sunpass-saga-day-69-conduent-says-everything-is-under-control/67-581626225 (last accessed April 22, 2019).

43. In July 2018 Conduent claimed to have fixed the problems, but the state reported that millions of tolls still hadn't been processed and residents continued to report the same issues.[2]

44. In February of 2019 Florida State Senator Janet Cruz referred to Conduent as "wholly unqualified" to administer Florida's cashless tolling systems.[3]

45. Recently, Conduent has been fined $4.6 million dollars by the state of Florida, and the state is currently suspending the collection of any fines or fees associated with Florida's cashless tolling system through at least June 1, 2019. [4]

46. In Texas, Conduent had similar problems. Faced with a flood of complaints, the Texas DOT had to launch toll amnesty programs in 2009 and 2011. In 2017, well into Conduent's contract with the state's TXTag program—the department suspended sending out bills for the pay-by-mail system because it had generated so many erroneous bills. There have been a variety of legislative efforts since then to attempt to correct the ongoing problems with Conduent's mismanagement of the TXTag program.[5]

---

[2] *See supra*, n.1.

[3] Fisher, Tyson. Florida lawmakers call for action against "wholly unqualified" SunPass contractor. LANDLINEMAG.COM, http://www.landlinemag.com/story.aspx?storyid=73720#.XL3S8TBKiUk (last accessed April 22, 2019).

[4] *See* Mower, Lawrence. *SunPass mess fallout: Vendor fined $4.6 million; state tolling director replaced*. MIAMI HERALD. March 29, 2019, https://www.miamiherald.com/news/state/florida/article228595424.html (last accessed April 22, 2019); *State hits SunPass contractor with $4.6 million fine*. TAMPA BAY BUSINESS JOURNAL, https://www.bizjournals.com/tampabay/news/2019/04/01/state-hits-sunpass-contractor-with-4-6-million.html (last accessed April 22, 2019);

[5] *See* Esposito, Frank. *In Texas, you could pay for cashless toll fines with a night in jail*. LOHUD. February 8, 2018. https://www.lohud.com/story/news/investigations/2018/02/08/cashless-tolls-new-york-texas/309385002/ (last accessed April 23, 2019).

47. According to an investigation by the Miami Herald, Conduent has had problems with customer service operations for electronic tolling systems in at least eight states: Florida, Michigan, Maryland, Rhode Island, New Hampshire, and New York. Among other problems, the contractor: failed to operate customer service website, user accounts and phone lines while updating tolling systems; failed to process toll charges and post them to the correct user accounts during system updates; and sent customers inflated bills that included late fees after those customers had never received an initial bill.[6]

48. In 2017 an ex-Xerox employee and anonymous whistleblower told KXAN-Austin that Conduent (then operating under Xerox) was rife with problems. "Their hiring practices, their billing practices, everything, its just—there is something wrong with that company…And there's nobody watching them. Who is watching them? Isn't there a government agency that's supposed to be overlooking this kind of stuff?"[7]

49. Senator Bill Nelson (D-Florida) and Gary Peters (D-Florida) have called for the Federal Trade Commission to investigate Conduent. They stated that "Conduent's pattern of mismanaging cashless toll systems is deeply troubling and warrants further scrutiny…If drivers are being hurt financially, the FTC should hold the company accountable."[8]

---

[6] Denham, Hannah. *SunPass is a mess, and probably will be for a while. Florida could have seen it coming.* MIAMI HERALD. July 18, 2018.
https://www.miamiherald.com/news/state/florida/article214889470.html (last accessed April 23, 2019).
[7] *See supra*, n. 6.
[8] Esposito, Frank. *Cashless tolls: Problems in New York, other states prompt request for federal probe.* LOHUD. August 3, 2018.
https://www.lohud.com/story/news/2018/08/03/cashless-tolling-federal-probe/890587002/ (last accessed April 23, 2019).

50. Conduent also has mismanaged other state programs unrelated to cashless tolling. For instance, it recently agreed to pay $236 million dollars to settle a Medicaid fraud lawsuit as a result of its management of dental benefits administration in that state.[9]

51. There can be no doubt that New York is experiencing the exact same sorts of problems that have plagued Conduent wherever it has gone.

52. The New York State Comptroller estimates that from January 1 through August 20, 2017 that there were 199,627 unbilled transactions due to errors with Conduent's cashless tolling system.  It stated that the number of unbilled transactions had increased "exponentially" during 2017 and that it would likely increase into the future as cashless tolling expanded.  This backlog is indicative of the same systemic errors and problems noted in Florida.

53. Since the Grand Island Bridge switched over to cashless tolling in 2016, residents of Erie and Niagara counties have been subjected to outrageous fines, often exceeding $1,000 dollars for non-payment of a few $1 tolls.[10]

---

[9] Dexheimer, Eric.  *Texas announces record $236M Medicaid fraud settlement*. HOUSTON CHRONICLE, Feb. 19, 2019. https://www.houstonchronicle.com/news/politics/texas/article/Texas-announces-record-236M-Medicaid-fraud-13627611.php (last visited April 23, 2019).

[10] *See* WHEC.  *Taking a toll: Webster mom facing a $1,581 Thruway Bill* (February 12, 2019)   https://www.whec.com/news/taking-a-toll-webster-mom-facing-a-1581-thruway-bill/5243974/ (last accessed March 8,. 2019); Christman, Samantha.  *How the $1 Grand Island toll turned into a $1,224 bill* (Aug 8, 2018).   THE BUFFALO NEWS, https://buffalonews.com/2018/08/10/how-the-1-grand-island-toll-turned-into-a-1224-bill/ (last accessed March 8, 2019); News 4 Staff.  *Cashless tolls at Grand Island bridges lead to $1,300 bill* (August 1, 2018).   WIVB.COM, https://www.wivb.com/news/local-news/cashless-tolls-at-grand-island-bridges-lead-to-1-300-bill/1338714404 (last accessed March 8, 2019). Sheer, Mark.  *SHEER: Thruway Authority charges $2,300 in fines on a $46 bill* (July 23, 2018).   THE NIAGARA GAZETTE, https://www.niagara-gazette.com/opinion/scheer-thruway-authority-charges-in-fines-on-bill/article_d32ae9f0-414d-5189-b0fa-670493ff59c2.html (last accessed March 8, 2019).

54. Many residents report that they received inadequate notice from Defendants, and only heard about their fines after the matter had already been referred to collections.[11]

55. In response to the public outcry over the excessive fines imposed by Defendants, New York State Senators Timothy Kennedy and Chris Jacobs have criticized the excessive the New York State Thruway Authority and have called for amnesty and additional reforms.[12]

56. Defendants often fail to send out notice until the $50 per toll has already been assessed.

57. Defendants often do not process unpaid tolls in a timely manner, frustrating any practical ability to pay the toll in the immediate aftermath of passing through the Grand Island Bridge cashless toll plaza.

58. Defendant's website is frequently non-functional, further frustrating the ability to timely pay tolls.

59. Once an administrative fee has been assessed, it is virtually impossible to have any meaningful conversation with Defendant Conduent or NYSTA about the

---

[11] *See, e.g.*, Vaughters, Al.  *WNY lawmakers call on Thruway to give drivers a break*. WIVB.COM, Aug. 20, 2018,  https://www.wivb.com/news/local-news/wny-lawmakers-call-on-thruway-to-give-drivers-a-break/1383864882 (last accessed April 11, 2019) ("I never got any type of toll bill, nothing. Then I got a letter saying you owe $204 within 15 days or your registration is suspended.")

[12] *See Jacobs calls for amnesty, asks governor to sign Toll Payers' Bill of Rights* (August 20, 2018), https://www.wnypapers.com/news/article/current/2018/08/20/133772/jacobs-calls-for-amnesty-asks-governor-to-sign-toll-payers-bill-of-rights (last accessed March 8, 2019); Timothy M. Kennedy.  *Highway Robbery: After Numerous Constituents Report Outrageous Late Fees on Grand Island Tolls, Kennedy Calls on Thruway Authority to Implement Amnesty Program & Pushes for Passage of Legislation* (August 20, 2018), https://www.nysenate.gov/newsroom/press-releases/timothy-m-kennedy/highway-robbery-after-numerous-constituents-report (last accessed March 8, 2019.

appropriateness of that fee.  Disputes are often met with simple recitations of the amount owed.

60. In sum, as in Florida, Texas and elsewhere, the system created by Defendants is impossible to navigate and untold numbers of residents acting in good faith have found themselves entangled in Defendants' web.

### DEFENDANTS PROFIT HANDSOMELY FROM CASHLESS TOLLING

61.  The cashless tolling business is a quite profitable for the named Defendants.

62. In June of 2017, Defendant NYSTA collected 1.4 million in Tolls-By-Mail fares, and 1.3 million in fines.  For the next seven months, it collected more from fines than it received in fares.

63. Defendant NYSTA projects that by 2022 it will make 66.8 million dollars annually on violation and late fees alone.

64. Conduent's top executives took home $21 million in salary and incentive based perks in 2017—despite ongoing problems in multiple states ensnaring thousands of Americans in a web of cruel bureaucracy.

65. A CNN expose on Linebarger Goggan Blair & Sampson described the firm as follows: "Yacths.  Mansions. Extravagant dinner parties.  Life is good for the founders of one of the nation's biggest government debt collectors."  One of its founders boasted that he lived in a 12,000 square foot mansion worth more than 5

million dollars.[13]   On its webpage, Defendant LGBS brags that it has recovered "billions" of dollars in government debt.[14]

### THE NAMED PLAINTIFFS EITEHR PAID OR WERE ORDERED TO PAY EXCESSIVE AMOUNTS WITHOUT DUE PROCESS

*FACTS PERTAINING TO PLAINTIFF CARL KETTLE*

66. Plaintiff Carl Kettle is the owner of a vehicle with a New York License Plate # HYL9413.

67. On September 21, 2018 Plaintiff Carl Kettle received a notice from the New York State Thruway Authority, claiming that he had traveled over the Grand Island Bridge without paying the cashless toll on June 7, 2018 (twice), and June 14, 2018 (twice).

68. The notice further alleged that he had not responded to two prior notices asking him to pay.  However, Plaintiff disputes that he received any prior notice.

69. The notice indicated that he was assessed a bill of $204.00 (of which $200 were administrative fees).  It did not include any mechanism for him to dispute either that he had passed through the toll, or the imposition of the administrative fees. A true and correct copy of this notice is attached hereto as **Exhibit B**.

70. Plaintiff subsequently submitted a written letter to the New York State Thruway Authority, along with a money order for $9.00.  In this letter, Plaintiff noted that he did not receive any prior notices, apologized for his actions, and asked the New York State Thruway Authority to accept the $9.00 as full payment and to waive any

---

[13] Ellis, Blake and Hicken, Melanie.  *Inside the lives of millionaire debt collectors. CNN.com.*  February 17, 2015.  https://money.cnn.com/interactive/pf/debt-collector/millionaire/index.html  (last accessed April 23, 2019).
[14] *See Linebarger Attorneys At Law*, *About*, https://www.lgbs.com/about-us/ (last accessed April 24, 2019).

additional late fees.  A true and correct copy of this notice, along with a money order receipt in the amount of $9.00, is attached hereto as **Exhibit C**.

71. On October 20, 2018, Plaintiff received a bill from the New York State Thruway Authority, advising him that he had crossed the Grand Island Bridge on September 13, 2018 (twice), September 15, 2018 (once), September 20, 2018 (once), and September 21, 2018 (once).  The total amount in tolls that was owed was $5.00.  He was also charged with a $7.00 "overdue balance" which was not explained on the bill. The notice also included "Late/Other Fees" of $5.00 which are not explained on the notice.  A true and correct copy of this notice is attached hereto as **Exhibit D**.

72. On October 24, 2018 Plaintiff received another notice.  This notice indicated that Plaintiff had also passed through the Grand Island Bridge cashless facility on July 26, 2018 (three times), and on August 2, 2018 (once).  As with the prior notice, it asserted that he had failed to respond to two previous notices, and that he owed $204.00 (with $200 amounting to "administrative fees").  Plaintiff disputes he received any prior notice regarding these alleged violations.  Moreover, the notice did not provide any mechanism for him to dispute either that he had passed through the toll, or the imposition of the administrative fee.  A true and correct copy of this notice is attached hereto as **Exhibit E**.

73. On November 4, 2018 Plaintiff paid the October 20, 2018 bill by sending a money order to the New York State Thruway Authority for $18.00. A copy of the money order receipt is attached hereto as **Exhibit F**.

74. Plaintiff also paid an additional $204.00 towards the October 24, 2018 bill.

75. Thereafter, Plaintiff received a notice from Linebarger, Goggan, & Sampson, LLP demanding $204.00 in payment. A photograph of this document is attached as **Exhibit G**.

76. Plaintiff retained counsel, who contacted Linbarger, Goggan & Sampson, LLP. It was acknowledged that Plaintiff paid $204.00, but it was claimed that he still owed $204.00 related to toll crossings from July and August.

77. It is not clear how Plaintiff's $9.00 payment in September of 2018 was credited.

78. Plaintiff has already paid Defendants $231.00.

79. It was very burdensome for Plaintiff to pay this amount, given that he has a fixed and very limited income through SSI.

80. The SSI program is a federal program designed to help certain indigent individuals meet their basic food, shelter, and clothing needs.

81. Plaintiff is unable to pay an additional $204.00 to Defendants and continue to meet his basic food, shelter, and clothing needs.

82. Moreover, if Plaintiff does not pay $204.00, the notice indicates that he will be subject to having the registration to his vehicle canceled.

83. Plaintiff is unable to walk long distances or take public transportation and therefore needs his vehicle to meet his basic food, shelter, and clothing needs. Plaintiff also needs his vehicle to make it to appointments for various medical conditions.

*FACTS PERTAINING TO PLAINTIFF LARRY BIESUZ JR*

84. Larry Biesuz Jr. is the registered owner of three vehicles, one of which has a New York License Plate # of HCL6667.

15

85. Larry Biesuz Jr.'s wife is the owner of an E-ZPass transponder.  At all times relevant to this complaint, the EZ-Pass transponder has been affixed to the vehicle with a License Plate # of HCL6667.

86. As to Plaintiff Bieusz Jr.'s other vehicles, no EZ-Pass was affixed to these vehicles. Mr. Biesuz Jr. would simply pay his monthly invoices that he received though the mail from Defendant NYSTA for any toll crossings he may have made in that month. He denies ever neglecting any invoice or notice from Defendant NYSTA.

87. On January 8, 2019 Plaintiff received a notice from Defendant LGBS claiming that he owed $68.20 in violations and fees related to one of Plaintiff's vehicles which did not have an EZ-Pass.  Although Plaintiff disputes that he owes this money, because he always pays his monthly invoices, he paid the $68.20 to make the issue go away.  A true and correct copy of the notice is attached as **Exhibit H**.

88. On January 22, 2019 Plaintiff received another notice from Defendant LGBS, stating that he owed $2,296.50 for an unspecified number of toll violations.

89. The notice alleges that this was in reference to License Plate #HCL6667.  However, as noted, this would be impossible because, at all times relevant to this complaint, that vehicle has had an EZ-Pass system.  A true and correct copy of this notice is attached hereto as **Exhibit I**.

90. Because there was EZ-Pass linked to the vehicle in question, and he always paid his monthly invoices on his other two vehicles, Plaintiff Biesuz Jr. called Defendant NYSTA.  He was told that they passed on any records of his alleged violations to Defendant LGBS.

16

91. When Plaintiff contacted LGBS by phone they stated that, in fact, Defendant NYSTA had the records.

92. Because Defendant LGBS had no records to justify its pursuit of the debt, it verbally informed Plaintiff that his account would be put into "dispute status."

93. Plaintiff subsequently received a second notice from Defendant LGBS dated February 28, 2019.

94. Once again, this letter stated that $2,296.50 was owed for alleged toll violations.  It made no reference of his account being placed into dispute status, nor did it indicate what the result of their review of his dispute revealed.

95.  In fact, this letter falsely stated that Defendant Linebarger, Goggan, Blair & Sampson had not responded to the previous correspondence.  Based on this misperception, Defendant LGBS stated it would assume the debt was valid.   A true and correct copy of this letter is attached as **Exhibit J**.

*FACTS PERTAINING TO PLAINTIFF DAVID TREDO*

96. Plaintiff David Tredo is the registered owner of a vehicle with a NY License Plate #HTN3212.

97. On May 28, 2018 Plaintiff Tredo received a notice from Defendant NYSTA, alleging that he had crossed the Grand Island Bridge six times in May of 2018, and therefore owed $6.00.  A true and correct copy of this notice is attached hereto as **Exhibit K**.

98. Plaintiff Tredo called Defendant NYSTA, and was informed that if he signed up to have an EZ-Pass account, and if he linked that account with a credit card, that the $6.00 owed would simply be debited out of his account.

99. Plaintiff Tredo signed up for an EZ-Pass account and linked it to his credit card upon this representation.

100.    However, on August 2, 2018 Plaintiff Tredo received a notice stating that he had not paid the $6.00.  An administrative fee of $50.00 was imposed for each of his six violations.   The letter demanded that he pay $306.00.   It did not include any mechanism for him to dispute the imposition of the administrative fees.  A true and correct copy of this notice is attached hereto as **Exhibit L.**

**CLASS ALLEGATIONS**

101.    Plaintiffs bring this case as a class action under Rule 23 of the Federal Rules of Civil Procedure 23.

102.    Plaintiff's proposed class is as follows:

> All residents of Erie and Niagara County who, from April 19, 2016 through April 19, 2019 have been ordered by Defendants to pay an administrative fee of $50.00 based on their alleged failure to pay the $1.00 cashless toll at the Grand Island Bridge cashless toll plaza.

103.    Plaintiff reserves the right to modify this proposed class definition, and attempt to certify sub-classes within this proposed class.

104.    A class action is appropriate and preferable in this case because:

    a.    **<u>Numerosity:</u>** The Grand Island Bridge is heavily used and there are likely to be hundreds, if not thousands of individuals who are similar situated to Plaintiffs in that they have already paid, or are being asked to pay excessive fines without due process.

    b.    **<u>Common Questions Predominate:</u>** There are questions of law and fact common to the class that predominates over any questions affecting only individual class members.  The principal issue being

18

whether Defendants are violating federal and state law by charging excessive fines for toll violations without due process.

c. **<u>Typicality:</u>** The Plaintiffs' claims are typical of other class members. Plaintiffs and all members of the Plaintiffs' classes have claims arising out of the Defendants' unlawful actions as alleged in this complaint.

d. **<u>Adequacy:</u>** The Plaintiffs will fairly and adequately protect the interests of the class members insofar as Plaintiffs has no interests that are adverse to the absent class members. The Plaintiffs are committed to vigorously litigating this matter. Plaintiffs have also retained counsel experienced in handling consumer lawsuits, complex legal issues, and class actions. Neither the individual Plaintiffs, nor their counsel have any interests which might cause them not to vigorously pursue the instant class action lawsuit.

e. **<u>Superiority:</u>** A class action is superior to the other available means for the fair and efficient adjudication of this controversy because individual joinder of all members would be impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum efficiently and without unnecessary duplication of effort and expense that individual actions would engender. Prosecution of separate actions by individual members of the class would also create the risk of inconsistent and varying adjudications resulting in the establishment of

inconsistent or varying standards for the parties and would not be in the interests of judicial economy.

105.    If the facts are discovered to be appropriate, Plaintiffs will seek to certify the class under Rule 23(b)(1), Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.

106.    Based on further discovery and further investigation (including, but no limited to, Defendant's disclosure of class size and net worth), Plaintiffs may, in addition to moving for class certification using modified definitions of the classes, class claims, and the class periods, seek class certification only as to particular issues as permitted under Fed. R. Civ. P. 23(c)(4).

## COUNT ONE

### §1983 Claim under the Eighth Amendment

107.    Plaintiffs hereby reallege and incorporate by reference herein, each and every allegation contained in this complaint as if fully set forth herein.

108.    The actions of the Defendants alleged herein violate the Eighth Amendment's prohibition on excessive fines.

109.    The fines imposed are out of proportion to the very minor offense of failure to pay a $1.00 toll.

110.    The fines imposed are not designed to be proportional to the offense, but are designed to punish toll violators and to deter non-compliance with cashless tolls.

111.    The imposition of this unconstitutionally excessive fine is the policy of the New York State Thruway Authority.

112.    Because said Defendants operated under color of state law, subjected Plaintiffs (and those similarly situated) to the deprivation of his 8th Amendment rights, said Defendants are liable to Plaintiffs (and those similarly situated) under 42 U.S.C.§1983.

113.    The actions of the Defendants in this count were reckless, willful and/or malicious and were otherwise committed with callous indifference to the rights of the Plaintiffs (and those similarly situated).  As such, punitive damages are appropriate.

**COUNT TWO**

**§1983 claim under the Fifth and Fourteenth Amendment (Procedural Due Process)**

114.    Plaintiff hereby realleges and incorporates by reference herein, each and every allegation contained in this complaint as if fully set forth herein.

115.    Defendants' are sending out notices that impose outrageous fines on residents of Erie County for non-payment of cashless tolls.

116.    Although these notices impose fines of $50 per alleged toll violation, they fail to provide any mechanism for residents to dispute the imposition of these fines.

117.    Had Defendant provided Plaintiffs with a reasonably clear way of contesting the fines imposed for non-payment, all three Plaintiffs would have very strong arguments that the amounts they owe should be reduced, or eliminated:

    a.  Plaintiff Carl Kettle would have a strong argument that the amount owed should, at least be reduced by $9.00.  Moreover he denies receiving the initial notices, and thus would have good cause for the elimination of the administrative fee.  Finally, given his status as an SSI recipient, he would have a strong case for a hardship waiver.

    b.   Plaintiff Larry Biesuz Jr. had an EZ-Pass account linked to the vehicle in question, and thus it is puzzling why he would owe any amount of money. Additionally, like Plaintiff Kettle, he denies receiving any notice that he did not pay. He has contacted Defendants asking for proof and was never provided any satisfactory response. He would have a strong argument that some sort of error was made by Defendants and that he does not owe $2296.50.

    c.  Plaintiff David Tredo would have a strong argument that Defendants' actions misled him into thinking he had taken care of his bill by signing up for EZ-Pass and linking it with his credit card.

118.   The common core of Plaintiff's experiences with the system created by Defendants is that they were denied any forum to dispute the imposition of the excessive administrative fees imposed on them by Defendants.

119.   Plaintiff's stories are hardly unique, as explained above.

120.   Particularly in light of the excessive nature of these fines, and the many issues residents have noted with the system, due process required Defendants to provide some reasonably clear mechanism, with defined standards, for Plaintiffs to dispute the imposition of these fines.

121.   Because said Defendant LGBS operated under color of state law, subjected Plaintiffs to the deprivation of his 5th and 14th Amendment rights, it is liable to Plaintiffs under 42 U.S.C.§1983.

122.   The actions of the Defendants in this count were reckless, willful and/or malicious and were otherwise committed with callous indifference to the rights of the Plaintiff.

123.    Defendants knew of Conduent's mismanagement, incompetence, and long track record of failing to effectively run cashless toll programs.  Yet, they failed to provide any dispute process as it relates to the administrative fees, showed callous disregard in attempting to collect outrageous amounts in fees, and have acted as though there is no problem.

124.    In a recent brief to the Southern District of New York, Conduent had the gall to say that the risk of it making errors in assessing administrative fines was exceedingly low.  *See* Dkt#91, p. 15 ("the risk of an erroneous judgment for an administrative fee is exceedingly low.").   Defendant Conduent's track record in New York and elsewhere belies this statement.

125.    In that same case, the New York Thruway Authority alleged that it was implausible that the Plaintiff in that case did not receive notices.  *See* Dkt#94, p. 22 (alleging that it is so implausible that the plaintiff in that case did not receive notice that the Court should dismiss the Plaintiff's complaint).

126.    All the while, it has been obvious based on news reports and complaints received by Defendants that there are widespread problems and eye-popping injustices related to the cashless tolling system at the Grand Island Bridge.

127.    Because Defendants have wantonly, willfully, and recklessly violated the civil rights of Plaintiffs and other class members, the imposition of punitive damages is appropriate.

## COUNT THREE

### Claim under the New York State Constitution

128.     Plaintiff hereby realleges and incorporates by reference herein, each and every allegation contained in this complaint as if fully set forth herein.

129.     By reason of the foregoing, the Defendants are also liable to the Plaintiff in tort for their violations of Plaintiff's rights secured and guaranteed by Article I, §5 the of the New York State Constitution forbidding excessive fines.

130.     By reason of the foregoing, Defendants are also liable to Plaintiffs in tort for their violation of Plaintiffs' rights secured and guaranteed by Article I, §6 of the New York State Constitution, which guarantees due process protections for life, liberty, and property.

131.     Because Defendants have wantonly, willfully, and recklessly violated the civil rights of Plaintiffs and other class members, the imposition of punitive damages is appropriate.

## COUNT FOUR

### Claim under New York General Business Law §349

132.      Plaintiff hereby realleges and incorporates each and every allegation contained in this complaint as if fully set forth herein.

133.     Defendants have engaged in consumer oriented activity.

134.     The form notices they send out assessing administrative fees have been sent out to thousands of New York Residents.

135.     These notices were deceptive for the reasons described in this complaint. Namely, the notices either: (a) falsely implied that prior notices had been sent and that they were not responded to; (b) sought to collect fines that were unconstitutionally excessive; (c) and asked for amounts not owed.

136.    These deceptive acts injured Plaintiffs and class members in that Plaintiffs were threatened with outrageous demands for payment backed by the power of the state and coupled with threats to cancel their vehicle registration.  Plaintiffs Kettle and Biesuz Jr., as well as many class members, were additionally harmed in that they did in fact pay money pursuant to these deceptive notices.

137.    Because Defendants have wantonly, willfully, and recklessly violated the civil rights of Plaintiffs and other class members, the imposition of punitive damages is appropriate.

**COUNT FIVE**
**Claim for fraud under the New York Common Law**

138.    Plaintiff hereby realleges and incorporates by reference each and every allegation raised in this complaint as if fully set forth herein.

139.    Defendants send out notices to Plaintiffs and other class members seeking the imposition of a $50 administrative fee based on the recipient's alleged failure to respond to previous notices.  No opportunity to dispute the imposition is given by the notices.

140.    These notices implicitly represent to any recipient that Defendants maintain accurate records and therefore have knowledge of non-payment despite two previous notices.  This is a materially misleading representation.

141.    In fact, Defendants know or should know that they can have no confidence that previous notices were sent.

142.    In fact, Defendants know or should know that they seek to impose administrative fees where the underlying toll has been paid.

143.    In fact, Defendants know or should know that their records are far from accurate.

144.    In fact, Defendants knew or should know that the outrageous administrative fees they were seeking were prohibited by law.

145.    Defendants make this material misrepresentation because they want to induce people into making payments rather than raising issues about their billing practices.

146.    Plaintiffs and/or class members who have actually paid Defendants money pursuant to these notices have done so in justifiable reliance on the representations made by Defendants, which have the backing of the state.

147.    Plaintiffs and/or class members who did not actually pay Defendants nevertheless justifiably relied on these representations.

148.    Plaintiffs and/or class members who paid money to Defendants have suffered economic damage.

149.    Plaintiffs and/or other class members who did not make any payments still suffered pecuniary harm.  These include but are not limited to: the time spent attempting to remedy Defendant's misleading and incorrect billing; inability to enroll in EZ-Pass or re-register their vehicle; and avoidance of cashless toll roads due to fears of having their car impounded or being charged other excessive fees.

150.    Because Defendants have wantonly, willfully, and recklessly violated the civil rights of Plaintiffs and other class members, the imposition of punitive damages is appropriate.

**RELIEF REQUESTED**

WHEREFORE, plaintiff demands judgment against each of the Defendants for :

1. Actual and compensatory damages.

2. Punitive damages.

3. Injunctive relief

4. Costs and attorneys fees 42 U.S.C.§1988.

5. Award such other and further relief that seems just and proper.

**A JURY TRIAL IS DEMANDED ON ALL ISSUES AND ON ALL COUNTS IN THE COMPLAINT.**

Dated: April 26, 2019                          /s/ Timothy Hiller, Esq._____
                                                                Timothy Hiller, Esq.
                                                                Seth Andrews, Esq.
                                                                Kenneth R. Hiller, Esq.
                                                                Law Office of Kenneth Hiller
                                                                *Attorneys for the Plaintiff*
                                                                6000 North Bailey Avenue, Ste. 1A
                                                                Amherst, NY 14226
                                                                (716) 564-3288
                                                                Email: thiller@kennethhiller.com
                                                                          khiller@kennethhiller.com
                                                                            sandrews@kennethhiller.com